Michael H. MOORE and Andrea
Wardenski Moore

v.

**BERKS COUNTY BOARD OF
ASSESSMENT APPEALS,**
Appellant.

Commonwealth Court of Pennsylvania.

Argued Nov. 15, 2005.
Decided Dec. 13, 2005.

Edwin L. Stock, Reading, for appellant.

Barbara J. Kern, Reading, for appellee.

BEFORE: SMITH–RIBNER, Judge,
FRIEDMAN, Judge, and FLAHERTY,
Senior Judge.

OPINION BY Judge FRIEDMAN.

The Berks County Board of Assessment
Appeals (Board) appeals from the May 6,
2005, order of the Court of Common Pleas
of Berks County (trial court), which re-
versed the Board's decision to terminate
the preferential use assessment for a
62.63–acre parcel of land located at 120
Old State Road, Alsace Township, Berks
County (Parcel 1) for the years 1997, 1998

and 1999. The order also reversed the Board's decision to terminate the preferential use assessment for a 15.88–acre parcel (Parcel 2) and a 12.43–acre parcel (Parcel 3) located on Apple Lane. We affirm in part and reverse in part.

In 1976, Michael H. Moore and Andrea Wardenski Moore (the Moores) purchased approximately eighty-nine acres of land and continued its use as a farm, raising hogs and producing corn, soybeans, winter wheat and hay.[1] The property included a residence and garage, five outbuildings, tillable land, pasture and woodland. Four of the five buildings were used to house livestock (Buildings A, B, D, E [2]); the other building was used to house farm equipment (Building H). The farm had a "lower driveway" leading from Old State Road to the residence and a "middle driveway" which served Building A. Shortly after purchasing the property, the Moores constructed a garage to house personal automobiles (Building G). Since 1981, the farm was known as Shamrock Farm. (Findings of Fact, Nos. 5–9, 18.)

On November 2, 1992, the Moores submitted an application to the Board, requesting preferential assessment for the eighty-nine-acre farm under the Pennsylvania Farmland and Forest Land Assessment Act of 1974,[3] commonly known as the Clean and Green Act. On the application, the Moores designated one acre as the "homesite," [4] thirty acres as "tillable," four acres as "pasture," fifty acres as "forest" and four acres as "residual." [5] The Moores did not designate any acreage as "other ineligible land." [6] The four acres designated as "residual" contained the existing buildings, a stream bed and a small pond. By notice dated October 28, 1993, the Berks County Assessment Office (Assessment Office) informed the Moores that the application had been accepted, effective January 1, 1994. (Findings of Fact, Nos. 19–20, 22–23.)

In 1994, the Moores constructed another building to store personal vehicles (Building F). In 1995, the Moores purchased approximately nine acres of land adjoining Shamrock Farm and annexed it to the property. The Moores then subdivided the combined acreage into four lots. The Moores sold one of the lots, and the other lots became Parcel 1, Parcel 2 and Parcel 3. Parcel 2 and Parcel 3 each had acreage from Shamrock Farm and the newly acquired nine acres. In 1996, 1997 and 1998, the Moores constructed additional buildings to store personal items and farm equipment (Buildings C, I, J, K). In 1996, the Moores also constructed an "end driveway" which facilitated access from the residence to the tilled fields. Eventually, the Moores constructed a "top driveway" connecting the ends of the existing driveways.

---

1. In 1990, the Moores discontinued the hog farming and eventually eliminated the growing of hay. (Findings of Fact, No. 5.)

2. The building designations are taken from Exhibit B–4. (*See* R.R. at 96a.)

3. Act of December 19, 1974, P.L. 973, *as amended,* 72 P.S. §§ 5490.1–5490.13.

4. The application defined "homesite" as follows: "Normally one acre is required for each occupied house. A farm with one house, barn and outbuildings require one acre." (Findings of Fact, No. 21.)

5. The application defined "residual" as follows: "The number of remaining acres of land which are not suitable for building sites, agricultural or forest land use. Normally restricted to swamp lands, ravines, etc." (Findings of Fact, No. 21.)

6. The application defined "ineligible land" as follows: "The acres necessary to support any non-agricultural use, for example: *commercial operation of a business including a parking lot.*" (Findings of Fact, No. 21.)

All of the eleven buildings are on Parcel 1. (Findings of Fact, Nos. 9, 13–16, 18.)

On February 25, 1997, the Moores applied to enroll in the preferential assessment program 4.76 acres which had been part of the annexed nine acres and became part of Parcel 2 and Parcel 3. By notice dated September 19, 1997, the Assessment Office informed the Moores that the application had been accepted, effective January 1, 1998. (Findings of Fact, Nos. 24–25.)

In 1998, the Moores began renting Building F to third parties for storage space. Between 1999 and 2001, the Moores began renting Buildings I, J and K; in 2001, the Moores began renting Building C. The Moores also rented portions of Buildings A and D. Altogether, the Moores rented 21,910 square feet to third parties for storage space, a commercial use. (Findings of Fact, Nos. 10–12.)

The Act of December 21, 1998, P.L. 1225 (Act 156) amended section 8(d)(1) of the Clean and Green Act to provide, in pertinent part, as follows:

> [A] landowner may apply a maximum of two acres of a tract of land subject to preferential assessment ... for a rural enterprise incidental to the operational unit without subjecting the entire tract to roll-back taxes, provided that: ...
> (iii) The rural enterprise does not permanently render the land incapable of producing an agricultural commodity.

72 P.S. § 5490.8(d)(1); (Findings of Fact, No. 26). By correspondence dated November 25, 2003, the Assessment Office notified the Moores that they had breached the Clean and Green Act by operating a rural enterprise that covered more than two acres. The Assessment Office terminated the preferential assessment and imposed roll-back taxes for seven years on Parcel 1 and for six years on Parcel 2 and Parcel 3, for a total of $52,519.04 in roll-back taxes.[7] (Findings of Fact, Nos. 27–31.)

The Moores appealed to the Board, which, after a hearing, upheld the roll-back taxes. The Moores paid the taxes but appealed to the trial court. The Moores subsequently sold Parcel 2 and Parcel 3. The Moores have not re-applied to enroll Parcel 1 in the preferential assessment program pending the outcome of their appeal. (Findings of Fact, Nos. 32–36.)

Before the trial court, the Board argued that the three parcels should not have been enrolled in the preferential assessment program because the Moores' 1992 application failed to designate the commercial portion of Shamrock Farm as "ineligible land." The trial court agreed that a material inaccuracy in the Moores' application would disqualify all of the tracts from enrollment in the program. However, the trial court concluded that the Board could not rely on an application defect to terminate the preferential assessment because the Board's notice to the Moores did not state this as the reason for termination of the preferential assessment. As for the stated reason, i.e., that the rural enterprise exceeded two acres, the trial court concluded that the Board could impose roll-back taxes only for Parcel 1 because the rural enterprise did not involve Parcel 2 or

---

7. Section 2 of the Clean and Green Act defines "roll-back tax" as follows:

   The amount equal to the difference between the taxes paid or payable on the basis of the valuation and the assessment authorized hereunder and the taxes that would have been paid or payable had that land been valued, assessed and taxed as other land in the taxing district in the current tax year, the year of change, and in six of the previous tax years or the number of years of preferential assessment up to seven.

   72 P.S. § 5490.2.

Parcel 3. The trial court also concluded that the Board could not impose roll-back taxes on Parcel 1 for 1997, 1998 and 1999 because Act 156 was not implemented in Berks County until 2000. The trial court remanded the matter to the Board for the re-calculation of the roll-back taxes and ordered a refund of all roll-back taxes improperly imposed, plus interest. The Board now appeals to this court.[8]

## I. Notice

■ The Board argues that the trial court erred in concluding that the Board's notice to the Moores regarding a material inaccuracy in the 1992 application was defective, thus precluding the imposition of roll-back taxes for 1997, 1998 and 1999. We disagree.

The Board "may not terminate preferential assessment of land previously determined by the [B]oard to qualify for preferential assessment without ... written *notice ... from the county assessor* to the landowner that preferential assessment is to be terminated, *stating the reason* for such termination and the opportunity for a hearing...." Section 3(d)(2) of the Clean and Green Act, 72 P.S. § 5490.3(d)(2) (emphasis added). With respect to notice from the county assessor, "it shall be the *duty* of the county assessor ... *[t]o notify in writing* the ... landowner of any preferential assessments ... terminated ... and *of the reason* for termination *within five days* of such change." Section 5(a)(2) of the Clean and Green Act, 72 P.S. § 5490.5(a)(2) (emphasis added).

The Board contends that it fulfilled the notice requirements by raising the inaccuracy of the Moores' 1992 application at a meeting with the Moores after they filed their appeal with the trial court. However, if we were to accept the Board's interpretation of the Clean and Green Act, the words "within five days" in section 5(a)(2) would have no meaning. The legislature requires that a landowner be notified of the reason for the termination of a preferential assessment "within five days" of the termination. The Board's notice of a different reason in a pre-trial meeting before the trial court beyond the five-day period does not meet this requirement. Thus, the trial court did not err in concluding that the Board's notice to the Moores regarding a material inaccuracy in the 1992 application was defective.

## II. Parcel 2 and Parcel 3

■ The Board argues that the trial court erred in concluding that the Board could not impose roll-back taxes on Parcel 2 and Parcel 3 under section 6(a.2) of the Clean and Green Act, 72 P.S. § 5490.6(a.2). We agree.

Section 6(a.2) of the Clean and Green Act states:

> The owner of land subject to preferential assessment may separate land. If a separation occurs, all tracts formed by the separation shall continue to receive preferential assessment unless, *within seven years of the separation, there is a subsequent change of use to one inconsistent with the provisions of section 3. Such subsequent change in use shall subject the entire tract so separated to roll-back taxes* as set forth in section 5.1.[9] The landowner

---

8. Our scope of review is limited to whether the trial court abused its discretion, committed an error of law or reached a conclusion not supported by substantial evidence. *Groner v. Monroe County Board of Assessment Appeals,* 569 Pa. 394, 803 A.2d 1270 (2002).

9. Section 5.1 of the Clean and Green Act states, in pertinent part, that, if a landowner changes the use of a tract of land subject to preferential assessment to one which is inconsistent with the provisions of section 3, the land so removed and the entire tract of which

changing the use of the land to one inconsistent with the provisions of section 3 shall be liable for payment of roll-back taxes.

72 P.S. § 5490.6(a.2) (emphasis added). A "separation" is a division of lands preferentially assessed into two or more tracts of land, the use of which continues to be agricultural use, agricultural reserve or forest reserve, and all tracts so formed meet the requirements of section 3 of the Clean and Green Act. 72 P.S. § 5490.2.

Here, after the Moores annexed nine acres in 1995, they divided the property into four tracts.[10] The Moores used Parcel 1, Parcel 2 and Parcel 3 consistent with section 3 of the Clean and Green Act until 1998, when they began to rent buildings on Parcel 1 for storage space. Because this inconsistent use of Parcel 1 in 1998 occurred within seven years of the separation in 1995, all three parcels are subject to roll-back taxes under section 5.1.[11]

### III.  Interest on Refund

■ Finally, the Board contends that the trial court erred in assessing interest on all monies to be refunded to the Moores. The Board argues that interest is due only from the date of the trial court's order.[12] We disagree.

In *Air Products & Chemicals, Inc. v. Board of Assessment Appeals*, 720 A.2d 790 (Pa.Cmwlth.1998), this court held that interest on a real property tax refund is not due from the date of overpayment but, rather, from the date of the court order resolving the dispute. However, the holding in *Air Products* has been superseded by statute. Section 8426(a) of the Local Taxpayers Bill of Rights Act, which became effective on January 1, 1999, states that "overpayments of tax due a local taxing authority, including taxes on real property, shall bear simple interest *from the date of overpayment* until the date of resolution." 53 Pa.C.S. § 8426(a) (emphasis added). Thus, the trial court did not err in assessing interest on all monies to be refunded to the Moores.

Accordingly, we affirm the trial court's decision to preclude the imposition of roll-back taxes based on the Board's defective notice of a material inaccuracy in the 1992 application. We also affirm the trial court's decision to assess interest on all monies to be refunded to the Moores. However, we reverse the trial court's decision to preclude the imposition of roll-back taxes on Parcel 2 and Parcel 3.

### ORDER

AND NOW, this 13th day of December, 2005, the order of the Court of Common Pleas of Berks County, dated May 6, 2005,

---

it was a part shall be subject to roll-back taxes plus interest at the rate of 6% per annum. 72 P.S. § 5490.5a. Section 5.1 also states: "After the first seven years of preferential assessment, the roll-back tax shall apply to the seven more recent tax years." 72 P.S. § 5490.5a.

10.  The Moores sold one tract. Its use is unknown, but, inasmuch as the Board does not base its imposition of roll-back taxes on the use of the fourth tract, we assume that its use is consistent with section 3 of the Clean and Green Act.

11.  We note that the Board also argues that, because Parcel 2 is 2.170 acres and Parcel 3 is 2.590 acres, neither could stand alone in the Clean and Green Act program, which sets a ten-acre minimum for enrollment. However, the trial court found that Parcel 2 is 15.88 acres and that Parcel 3 is 12.43 acres, which means that each exceeds the ten-acre minimum.

12.  We note that, at oral argument, the Board conceded that interest is due from the date of the overpayment.

is reversed to the extent that it precludes the imposition of roll-back taxes on the 15.88–acre parcel (Parcel 2) and the 12.43–acre parcel (Parcel 3) located on Apple Lane. The order is affirmed in all other respects.